ASSOCIATION CONCERNED OVER          )
RESOURCES AND NATURE, INC.,         )
                                    )
            Plaintiff,              )          No. 1:10-00084
                                    )          JUDGE HAYNES
v.                                  )
                                    )
TENNESSEE ALUMINUM                  )
PROCESSORS, INC.,                   )
                                    )
            Defendant.              )

## M E M O R A N D U M

Plaintiff, Association Concerned Over Resources and Nature, Inc. ("ACORN"), filed this

action under the Clean Water Act, ("CWA"), 33 U.S.C. § 1365(a)(1) and the Resource Conservation

and Recovery Act, ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), against the Defendant, Tennessee

aluminum Processors, Inc., ("TAP"). Plaintiff's claims arise out of Defendant's alleged improper

disposal of aluminum slag waste at Defendant's facility located in Mount Pleasant, Tennessee. In

sum, Plaintiff alleges that Defendant operates an open dump stockpiled with aluminum slag waste

that results in the repeated and ongoing discharge of pollutants, including leachate containing

ammonia and chlorides, into an unnamed tributary of Quality Creek and the city of Mount Pleasant's

sewerage system.

Before the Court is the Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (6)

(Docket Entry No. 11), contending, in sum: (1) that the Court lacks subject matter jurisdiction

because Plaintiff's notice letter fails to comply with the notice requirements under the CWA and the

RCRA; (2) that citizen suits will not lie against wholly past violations; (3) that groundwater is not regulated under the CWA; and (4) that the RCRA bars citizens from enforcing "open dump" claims.

In its response (Docket Entry No. 18), Plaintiff contends, in essence: (1) that its notice letter provided sufficient information for Defendant to identify the violations and to comply with the CWA and RCRA; (2) that the CWA and RCRA claims are actionable because Defendant's violations are continuing and are not wholly past; (3) that the CWA does not regulate ground water is irrelevant; and (4) the RCRA does not distinguish between maintaining an open dump and open dumping.

For the reasons set forth below, the Court concludes that Plaintiff has stated claims for relief and Defendant's motion to dismiss should be denied as Plaintiff has alleged sufficient facts to provide the requisite notice and otherwise state plausible CWA and RCRA claims in its pleadings.

## I. ANALYSIS OF THE MOTION

Plaintiff is a nonprofit corporation organized under the laws of Tennessee with its principal office in Columbia, Tennessee. (Docket Entry No. 1, Complaint, at ¶ 8). Plaintiff's mission is to educate the public about the threats to the environment and public health in Mount Pleasant, Tennessee. Id. Plaintiff consists of members who own property and reside on or near Defendant's facility and Quality Creek, as well as members who own property and reside downstream of Defendant's facility. Id.

The Defendant, a Tennessee corporation with its principal office in Mount Pleasant, Tennessee, operates an aluminum processing/smelting facility in Mount Pleasant. Id. at ¶¶ 10, 27. In or about 1983, Defendant began disposing of the aluminum dross waste in slag waste stockpile at Defendant's facility. Id. Defendant's practice of maintaining the slag waste stockpile continues to the present. Id.

On August 16, 1989, Defendant and the Tennessee Department of Health and Environment, Division of Water Pollution Control, ("DWPC") Office of Water Management, entered into an Agreed Order requiring Defendant to cover the stockpile in a manner that would prevent rainfall from coming into contact with the stockpile, to submit and implement a remedial action plan by August 15, 1990, to assure that all of the aluminum dross was stored or disposed of in a manner that eliminated the unlawful discharge of pollutants into Tennessee waters and to pay a civil penalty up to $30,000 if Defendant did not comply with the order. (Docket Entry No. 11, Exhibit 1 at 6-7).[1]

Plaintiff alleges that by late December 1991, Defendant had stored approximately 125,000 cubic yards of slag waste in the slag waste stockpile. (Docket Entry No. 1, at ¶ 28). According to Plaintiff, despite repeated requests and orders of the Tennessee Department of Environment and Conservation ("TDEC") demanding that Defendant remove all of the slag waste from the facility, a 2001 survey found that the slag waste stockpile still contained 118,750 cubic yards of slag waste. Id. The solid waste in the slag waste stockpile contains, amongst other constituents, aluminum, ammonia, chlorides, lead and manganese. Id. at ¶ 29.

On October 8, 2003, TDEC and Defendant entered into an Agreed Order, issued by the Tennessee Solid Waste Disposal Control Board that ordered Defendant to remove the stockpile at the rate of 24,000 tons of stockpiled material per year and pay a civil penalty in the amount of

---

[1]In considering a motion to dismiss, a Court may "consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999) overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2002) ("[A] Court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority.") (citing Int'l Bhd. of Teamsters v. Zantop Air Transp. Corp., 394 F.2d 36, 40 (6th Cir.1968)).

$100,000, portions of which were waivable upon Defendant's compliance with the schedule. (Docket Entry No. 11, Exhibit 2 at 10-16).

On June 2, 2010, Plaintiff sent its Notice of Intent to File Citizen Suit against the Defendant under the CWA and RCRA to the Defendant, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the EPA Regional Administrator, TDEC, and the United States Attorney General. (Docket Entry No. 1, at ¶¶ 4-5). Plaintiff's notice letter states, in relevant part:

> The purpose of this letter is to notify Tennessee Aluminum Processors, Inc. ("TAP"), that the Association Concerned Over Resources and Nature, Inc. ("ACORN") . . . intends to file suit in sixty (60) days under the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), in Federal District Court against TAP for violations of the CWA and RCRA resulting from the disposal of solid waste from aluminum processing at the TAP facility in Mount Pleasant; Tennessee. This solid waste contains aluminum, ammonia and chlorides. . . . Following are the violations that will be addressed in the citizen suit.
>
> ### I.     VIOLATIONS OF THE CLEAN WATER ACT
>
> A.     <u>Discharging Pollutants to Surface Waters Without an NPDES Permit</u>
>
> Since at least 1989 TAP has violated the Clean Water Act, 42, U.S.C. § 1311(a) and 40 C.F.R. § 122.21, by discharging leachate from an aluminum processing waste pile on its property through discrete conveyances to an unnamed tributary of Quality Creek, waters of the State of Tennessee and the United States, without an NPDES permit for the discharges pursuant to 33 , U.S.C. § 1342. The leachate contains high levels of ammonia and chlorides, which are pollutants under the CWA. **These discharges are continuing and will continue in the future. On January 22, 2010, 1300 mg/l ammonia and 33000 chloride was measured in the discharge to the unnamed tributary, and as recently as March 25, 2010, 1200 mg/l ammonia was measured in the discharge to the unnamed tributary.** The requirement for an NPDES permit authorizing these discharges arose at the time that TAP first knew or should have known that waste pile leachate was being discharged into surface waters. Each day since that time is a violation of the CWA.
>
> B.     <u>Violations of NPDES Permit No. TNR050000 and TNR053682</u>

TAP is covered under the NPDES Tennessee Storm Water Multi-Sector General Permit for Industrial Activities, Permit No, TNR050000, and is registered under Tracking No. TNR052682. TAP has violated and is violating Section 3.1.2 of this Permit by discharging unauthorized materials other than storm water without an NPDES permit. Since at least 1989, TAP has been discharging leachate from an aluminum processing waste pile at the site without an NPDES permit issued for the discharges, as described in I.A.., above. Each day that waste pile leachate has been discharged by TAP is a violation of the Permit and the CWA.

C.    Violations of the Pretreatment Requirements of the Clean Water Act

**Since at least January 2010, TAP has violated and continues to violate the Clean Water Act, 42 U.S.C. § 1311(a), by discharging industrial wastewater into the City of Mount Pleasant sewer system without complying with 42 U.S.C. § 1317 and rules promulgated by the U.S. Environmental Protection Agency ("EPA") and the Tennessee Department of Enviromnent and Conservation ("TDEC") to implement the industrial pretreatment program.** Leachate from the TAP aluminum processing waste pile containing high levels of ammonia has been and continues to be introduced into the Mt. Pleasant sewer collection system pipes and manholes as a result of ground water contamination. **These high levels of ammonia continue to pass through and/or interfere with the operation of the City of Mount Pleasant publicly owned treatment works ("POTW") and continue to cause or contribute to ammonia effluent limit violations of the City of Mount Pleasant's NPDES Permit No. TN0020800.**

Industrial Pretreatment rules apply to "pollutants from non-domestic sources covered by Pretreatment Standards which are indirectly discharged into or transported by truck or rail or otherwise introduced into POTWs," 40 C.F.R. § 403.1(b) (See also TDEC Pretreatment Requirements at Rule 1200-4-14-.01). In addition to the prohibition of 33 U.S.C. § 1311(a), Tenn. Code Ann. § 69-3-125(a)(l)(C) makes it illegal to fail to complete a filing requirement of a pretreatment program. TAP continues to indirectly discharge or otherwise introduce covered pollutants (ammonia) into the City ofMount Pleasant POTW, but has violated 33 U.S.C. § 131l(a) and Tenn. Code Ann. § 69-3-125(a)(1)(C) by failing to apply for and obtain a pretreatment permit from the City of Mount Pleasant pretreatment program.

40 C.F.R. § 403.5(a) makes it a violation of the CWA to "introduce into a POTW any pollutant(s) which cause Pass Through or Interference" (See also TDEC Rule 1200-4-14.05(1)(a)). **TAP has violated this provision by introducing ammonia contaminated leachate into the City of Mount Pleasant POTW since at least January 2010, including, but not limited to, the following dates:**

• **January 21,2010**

- **February 4, 2010**
- **February 5, 2010**

The leachate continues to pass through or interfere with the Mount Pleasant POTW, as those terms are defined by 40 C.F.R. § 403.3 (See also TDEC Rule 1200-4-14-.03).

## II.    VIOLATIONS OF RESOURCE CONSERVATION AND RECOVERY ACT

The TAP facility is being operated in such manner as to constitute an open dump, as that term is defined in 42 U.S.C. § 6903(14) and in 40 C.F.R. Part 257. Under 42 U.S.C. § 6945(a) and 40 C.F.R. § 257.1(a)(1) and (2), the operation of an open dump is prohibited

The TAP facility constitutes an open dump,. pursuant to 40 C.P.R. § 257.3-3, because the aluminum processing waste pile on the property has discharged and is discharging pollutants into surface waters in violation of the requirements of the National Pollutant Discharge Elimination System ("NPDES") of the CWA. Specifically, as set out in Section I. above, the facility has discharged and is discharging contaminated leachate from the waste pile into surface waters through discrete conveyances at least since 1989. The leachate contains high levels of ammonia and chlorides, which are pollutants under the CWA. The requirement for an NPDES permit authorizing these discharges arose at the time that TAP first knew or should have known that waste pile leachate was being discharged into surface waters.

The TAP facility also constitutes an open dump, pursuant to 40 C.F.R. § 257.3--4, because the leachate from the aluminum processing waste pile on the property has contaminated an underground drinking water source beyond the solid waste boundary. Samples of ground water taken outside the TAP property boundary in January and February 2010 have shown high levels of ammonia.

## III.    CONCLUSION

. . . . Unless the EPA or TDEC commences and diligently prosecutes an action in court to address these violations within sixty (60) days, we intend to file a citizen suit against the Tennessee Aluminum Processors, Inc., under 33 U.S.C. § 1365(a)(l) and 42 U.S.C. § 6972(b) for the violations discussed above. . . .

Id., Exhibit A at 2-4 (emphasis added).[2]

---

[2] As discussed *infra*, exhibits to a complaint are deemed to be part of the complaint.

In its first claim, Plaintiff asserts that Defendant violated the CWA by discharging pollutants into surface waters without a National Pollutant Discharge Elimination System ("NPDES") permit. (Docket Entry No. 1, Complaint at 10). Plaintiff alleges, in pertinent part:

> 45. Defendant TAP's discharge of contaminated leachate from the slag waste stockpile located at the TAP facility through discrete conveyances constitute discharges from a point source into an unnamed tributary of Quality Creek requiring an NPDES permit authorizing such discharges.

> 46. Since at least 1989, and on the specific occasions lists in Paragraph 31,[3] TAP has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging contaminated leachate from the slag waste stockpile into an unnamed tributary of Quality Creek without an NPDES permit authorizing such discharges.

Id. at ¶¶ 45-46.

Plaintiff's second claim alleges that Defendant unlawfully discharged unauthorized materials other than stormwater. Id. at ¶¶ 52-53. Plaintiff's third claim is that the previously alleged circumstances violate the CWA's pretreatment requirements. Id. at ¶¶ 57-59. Specifically, Plaintiff alleges the following:

> Since January of 2010, and including, but not limited to, the dates of January 21, 2010, February 4, 2010, and February 5, 2010, TAP has violated the CWA and rules implementing the industrial pretreatment program by introducing stockpile leachate contaminated with ammonia into the City of Mount Pleasant's [publicly owned treatment works] POTW, which leachate has and continues to cause Pass Through or Interference with the operation of the POTW, and has caused or contributed, and continues to cause or contribute, to ammonia effluent limit violations of the City of Mount Pleasant's NPDES Permit No. TN0020800.

_____

[3]Paragraph 31 alleges: "Sampling of the stockpile leachate discharge conducted on January 22, 2010, found 1300 mg/l of ammonia in the discharge. Furthermore, sampling of the stockpile leachate discharge conducted on March 25, 2010 found 1200 mg/l of ammonia in the discharge, as well as 33,000 mg/l of chloride." (Docket Entry No. 1, at ¶ 31).

Id. at ¶ 60. Plaintiff's fourth claim relies upon its factual allegations to assert that Defendant maintains an "open dump" in violation of RCRA. Id. at ¶¶ 64-70.

## II. CONCLUSIONS OF LAW

Fed. R. Civ. P. 12(b)(1) provides for dismissal of a claim for lack of subject matter jurisdiction that may consist of either a "facial attack" or a "factual attack." O'Bryan v. Holy See, 556 F.3d 361, 375 (6th Cir. 2009).

> "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." And, "[w]hen reviewing a facial attack, a district court takes the allegations in the complaint as true.... If those allegations establish federal claims, jurisdiction exists." However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."

Id. at 375-76 (citations omitted). "A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). On a factual attack, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. (citation omitted). "[A] trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990). The plaintiff bears the burden of proof that jurisdiction exists under 12(b)(1). RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir. 1996).

Upon a motion to dismiss under Rule 12(b)(6), "a civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 (6th Cir. 2009)

(quoting Ashcroft v. Iqbal, _ U.S. _, 129 S.Ct. 1937, 1949 (2009)) (citation omitted). The Court must "'construe the complaint in the light most favorable to the plaintiff, accept all its allegations as true, and draw all reasonable inferences in favor of the plaintiff.'" In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) (citation omitted). The Court "'need not accept as true legal conclusions or unwarranted factual inferences . . . and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'" Id. at 903 (citations and quotation marks omitted).

In Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), the Supreme Court explained the requirements for sustaining a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Id., at 555 (citing Papasan v. Allain, 478 U.S. 265, 286, (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id., at 557.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id., at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id., at 557 (brackets omitted).
>
> Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id., at 555, . . . Second, only a complaint that states a plausible claim for relief survives a motion to

dismiss. Id., at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 1949-50.

As the Sixth Circuit stated, "[a] motion under rule 12(b)(6) is directed solely to a complaint itself . . . [.]" Sims v. Mercy Hosp., 451 F.2d 171, 173 (6th Cir. 1971). Yet, in evaluating a plaintiff's complaint, under Fed. R. Civ. P. 10(c), any matters attached to the pleadings are considered part of the pleadings as are documents that a defendant attaches to a motion to dismiss that are referred to in the complaint and "central" to the claim. Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997).

Defendant contends that the Court lacks subject matter jurisdiction because Plaintiff's notice letter fails to comply with the CWA's and RCRA's notice requirements as Plaintiff's notice letter failed to describe Defendant's alleged violations with enough specificity to allow Defendant to correct any violations. Plaintiff contends that its notice letter contained sufficient information as required by law to apprise Defendant of the alleged violations so that Defendant could take corrective action.

Plaintiff seeks injunctive relief under the CWA, 33 U.S.C. § 1365(a)(1), that provides, in pertinent part, that "any citizen may commence a civil action on his own behalf against any person

. . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator[4] or a State with respect to such standard or limitation." Similarly, under the RCRA, 42 U.S.C. § 6972(a)(1)(A), "any person may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." Citizen actions, however, may not be brought "for wholly past violations." Gwaltney of Smithfield, Inc. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 64 (1987). As the Supreme Court in Gwaltney explained, "'to be in violation'" is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation." Id. at 57.

Before a citizen may file a citizen suit under either the CWA or the RCRA, the citizen must first give notice of the alleged violation to the EPA Administrator, the State and to the alleged violator. 33 U.S.C. § 1365(b)(1)(A); 42 U.S.C. § 6972(b)(1)(A). Thus, "[C]ompliance with the notice requirement is a jurisdictional prerequisite to recovery under the statute[s]." Board of Trustees of Painesville Tp. v. City of Painesville, 200 F.3d 396, 400 (6th Cir. 1999). Requiring citizens to comply with the notice requirements under the CWA and RCRA serves two purposes. "First, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits. . . . [as] an agency may be able to compel compliance through administrative action, thus eliminating the need for any access to the courts." Hallstrom v. Tillamook County, 493 U.S. 20, 29 (1989) (citation omitted). Second, the notice

---

[4]The Administrator is the Administrator of the Environmental Protection Agency (EPA). 33 U.S.C. § 1251(d).

requirement affords the alleged violator "an opportunity to bring itself into complete compliance with the Act[s] and thus likewise render unnecessary a citizen suit." Gwaltney, 484 U.S. at 60.

The notice for a citizen suit under the CWA requires the following:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3. Similarly, notice under the RCRA requires the following:

> sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 254.3.

"'[T]he notice requirement is not a mere technical wrinkle of statutory drafting or formality to be waived by the federal courts,'" Walls v. Waste Resource Corp., 761 F.2d 311, 317 (6th Cir. 1985) (citation omitted), nor is it "unfair to require strict compliance with statutory conditions precedent to suit." Hallstrom, 493 U.S. at 28. "[T]he Sixth Circuit . . . [has] held that citizens providing notice to alleged violators must strictly comply with the notice requirements as set forth in the statute and the regulations promulgated thereunder." Sierra Club Ohio Chapter v. City of Columbus, 282 F. Supp.2d 756, 763, 775-76 (S.D. Ohio 2003) (citing Atl. States Legal Found. v. United Musical Instruments, 61 F.3d 473, 478 (6th Cir. 1995); Frilling v. Village of Anna, 924 F. Supp. 821, 833 (S.D. Ohio 1996)); Stephens v. Koch Foods, LLC , 667 F. Supp.2d 768, 785 (E.D. Tenn. 2009) ("Strict compliance with [33 U.S.C. § 1365(b)] is a mandatory jurisdictional prerequisite for a citizen suit.") (citing Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.,

175 F. Supp.2d 1071, 1077 (E.D. Tenn.2001) (citing <u>Greene v. Reilly</u>, 956 F.2d 593, 594 (6th Cir.1992)); <u>see</u> <u>also</u> <u>City of Newburgh v. Sarna</u>, 690 F. Supp.2d 136, 147 (S.D.N.Y. 2010) ("Strict compliance with the CWA's notice provision 'is a mandatory, not optional, condition precedent for suit.'") (quoting <u>Hallstrom</u>, 493 U.S. at 26); <u>Garcia v. Cecos Intern., Inc.</u>, 761 F.2d 76, 79-80 (1st Cir. 1985); <u>Washington Trout v. McCain Foods, Inc.</u>, 45 F.3d 1351, 1354 (9th Cir. 1995) ("The [<u>Hallstrom</u>] Court held the notice requirement under the regulations was to be strictly construed."); <u>accord</u> <u>Monongahela Power Co. v. Reilly</u>, 980 F.2d 272, 275 n.2 (4th Cir. 1992); <u>American Canoe Ass'n, Inc. v. District of Columbia Water and Sewer</u>, 306 F. Supp.2d 30, 35 (D.D.C. 2004) ("Strict compliance with [40 C.F.R. § 135.12(a)] is a mandatory jurisdictional prerequisite for a citizen suit."); <u>but see</u> <u>Fitzgibbons v. Cook</u>, No. 1:08-CV-165, 2008 WL 5156629, at *7 (W.D. Mich. Dec. 8, 2008) (noting, without deciding, disagreement among the courts as to how specific a notice letter must be in providing "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated.").

Defendant contends that Plaintiff's notice letter fails to meet the strict standard of specificity required in this Circuit, rendering the notice letter defective. Specifically, Defendant asserts: (1) that Plaintiff failed to identify what the "discrete conveyances"were; (2) that Plaintiff failed to identify what the specific "operation" was that caused the alleged violation; (3) that Plaintiff alleged that the stockpile allegedly contaminated an "underground drinking water source," but did not identify the alleged drinking water source; (4) that Plaintiff alleged that Defendant was introducing industrial wastewater into Mount Pleasant's sewer collection system pipes and manholes without a permit, but Plaintiff did not identify the location of the collection pipes and manholes; (5) that Plaintiff's assertion that violations under the CWA and RCRA were "continuing" or that they "will continue

into the future" was insufficient to give Defendant notice of when the alleged violations occurred, or when and why they are likely to reoccur in the future; and (6) that Plaintiff improperly threatened suit under 42 U.S.C. § 6972(b) that imposes requirements upon citizens, not upon the alleged violator.

Plaintiff responds that the notice letter complied with the EPA's notice rules because in determining the sufficiency of notice, courts "require no more than 'reasonable specificity.'" See San Francisco BayKeeper, Inc. v. Tasco Corp., 309 F.3d 1153, 1158 (9th Cir. 2002) (citing Pub. Interest Research Group v. Hercules, Inc., 50 F.3d 1239, 1248 (3d Cir.1995) and Catskill Mtns. Chapter of Trout Unlimited, Inc. v. New York, 273 F.3d 481, 488 (2d Cir. 2001)); Assateague Coastkeeper v. Alan and Kristin Hudson Farm, 727 F. Supp.2d 433, 439 (D. Md. 2010).

In Frilling, the Ohio district court rejected the Third Circuit standard in Hercules, 50 F.3d at 1251-52, that notice of violations of the "same type" or that are "directly related" is sufficient, concluding that based upon United Musical Instruments, "this Court holds that plaintiffs bringing suit under 33 U.S.C. § 1365 must provide notice of the *specific* limitations, standards, or orders alleged to be violated." 924 F. Supp. at 833 (emphasis in original). The Ohio district court explained:

> [T]he policy reasons for requiring Plaintiffs to identify the specific standard(s), limitation(s), or order(s) alleged to have been violated, is two-fold: *first*, such specific notice will allow government agencies to evaluate fully and adequately the violations alleged, and thereby to determine accurately their appropriate level of involvement in the matter; *second*, such specific notice will allow the recipient an opportunity to cure the violations before suit is brought, which may obviate the need for a costly lawsuit.

Id. at 834.

In Sierra Club, an Ohio district court also rejected the "notice in fact" standard: "[B]oth United Musical Instruments and Frilling interpret the Supreme Court's holding in Hallstrom to mean that strict compliance with the notice requirements is required with respect to content, and not just with respect to the giving of notice." 282 F. Supp.2d at 764-65 n.8; see also Center for Biological Diversity v. Marina Point Dev. Co., 566 F.3d 794, 801 (9th Cir. 2009) (distinguishing San Francisco BayKeeper, and observing that "We have sometimes been slightly forgiving to plaintiffs [as to what a sufficiently detailed notice might be], but even at our most lenient we have never abandoned the requirement that there be a true notice that tells a target precisely what it allegedly did wrong, and when.").

"[T]the notice is not just an annoying piece of paper intended as a stumbling block for people who want to sue; it is purposive in nature and the purpose is to accomplish corrections where needed without the necessity of a citizen action." Id. at 800. A court must keep a notice's "overarching public purposes in mind." Id. at 801. Thus, the issue before the Court is not so much whether Plaintiff strictly complied with the notice requirement, but whether the notice provided sufficient information for Defendant to remedy any alleged violations.

Defendant contends that because Plaintiff failed to identify the "discrete conveyances" from which leachate from the slag waste stockpile was discharged into an unnamed Quality Creek tributary, Defendant lacked sufficient information to remedy the alleged violations. "Discrete conveyances" is mentioned in reference to a "point source" from which pollutants are discharged. The CWA defines the term "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container,

15

rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

> A pipe from a factory draining effluent into a navigable water is a point source, but the factory itself is not. This is clear from the text of the Act[.] . . . Under most circumstances, a "pipe, ditch, channel, tunnel, [or] conduit" is unlikely to have created the pollutants that it releases, but rather transports them from their original source to the destination water body. . . . [A] "tunnel," . . . plainly qualifies as a point source. The tunnel itself need not have created the pollution; it is enough that it conveys the pollutants from their original source to the navigable water.

Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 493 (2d Cir. 2001).

In Karr v. Hefner, 475 F.3d 1192 (10th Cir. 2007), the plaintiffs' notice letter alleged violations of point-source-discharge limitations at a well site, identified as "TAMI No. 1-26." Id. at 1201-1203. There, plaintiffs' notice letter alleged that the defendants caused construction to commence and continue at TAMI No. 1-26, causing a continuous release of pollutants "as indicated by the presence of acid rock drainage at the TAMI No. 1-26 flowing into the waters [and tributaries] of the United States" as well as "[c]ausing heavy metals to continuously or intermittently discharge from the TAMI No. 1-26 into a tributary of Kiamichi River." Id. at 1201-02 n.3. The Tenth Circuit stated, "It is not apparent from the notice letter what "discernible, confined and discrete conveyance" has discharged the alleged pollutants." Id. at 1203. Responding to the contention that the plaintiffs failed to identify a point source, the plaintiffs stated that "TAMI No. 1-26," a well, was the source. The Court stated, "But the notice letter does not suggest that pollutants are emanating from the well itself. On the contrary, the letter states that the pollution arises from 'construction activities' at the well site not the operation of the well." The Court concluded that the notice letter failed to comply with 40 C.F.R. § 135.3(a), in part, because it did not specify a point source. Id. at 1205.

In Mervis Industries, Inc., v. PPG Industries, Inc., No. 1:09-cv-0633-SEB-JMS, 2010 WL 1381671 (S.D. Indiana, March 30, 2010), the defendant argued that the plaintiff failed to state a claim because it did not identify a point source from which pollutants were discharged. Id. at *4. In considering the defendant's 12(b)(6) motion as to the plaintiff's CWA claim, the district court concluded:

> "The structure of the CWA's definition of 'point source' (a 'discernible, confined, and discrete conveyance ... from which pollutants are or may be discharged') connotes the terminal end of an artificial system for moving water, waste, and other materials." Froebel v. Meyer, 217 F.3d 928, 937 (7th Cir.2000) (citing United States v. Plaza Health Laboratories, 3 F.3d 643, 646 (2d Cir.1993) (noting that the definition "evoke[s] images of physical structure and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways")). A point source refers to the "proximate source from which the pollutant is directly introduced to the destination water body." Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 493 (2d. Cir.2001).

> Mervis has alleged that PPG landfilled construction materials on the Properties and that the contamination is now leaching and migrating into Wildcat Creek. However, Mervis has failed to identify any "defined, discrete conveyance" on the Properties by which pollutants are discharged into Wildcat Creek, nor has it alleged any facts from which we may infer that pollutants are being discharged via a "defined, discrete conveyance" into Wildcat Creek. A general statement that contaminants are now migrating or leaching into Wildcat Creek is not sufficient to state a claim under the CWA.

Id.

The Court concludes that, although Plaintiff does not identify the specific discrete conveyance by which pollutants are being discharged into the unnamed Quality Creek tributary, Plaintiff's notice provides sufficient information to permit Defendant to identify the alleged violations and bring itself into compliance by remediating the alleged violations, namely the slag waste stockpile at Defendant's business. Moreover, Plaintiff's allegation in section I.C. is that leachate is being introduced into Mt. Pleasant's sewer collection system pipes and manholes. This

allegation provides Defendant with sufficient information as to the alleged violation and that leachate is entering Mt. Pleasant's sewer system. Here, given the Defendant's prior history with state environmental enforcement as reflected in the agreed orders, Defendant has been aware of the discharges from the slag waste stockpile since 1989.

As to Plaintiff's RCRA claim, Defendant contends that Plaintiff's notice letter alleged that Defendant operated the stockpile in a manner constituting an open dump, but did not identify the alleged "operation" with any specificity. Defendant argues that it has not used the stockpile since 1989 and is currently removing the stockpile pursuant to the 2003 Agreed Order with TDEC.

Plaintiff asserts that its notice letter provided sufficient information describing the alleged "operation" or activity in question. Plaintiff cites the notice letter's opening paragraph that states that it intends to file suit against Defendant for violations under the CWA and RCRA "resulting from the disposal of solid waste from aluminum processing" at Defendant's Mt. Pleasant facility. Plaintiff further argues that the notice letter states that Defendant's facility constitutes an open dump as the aluminum processing waste pile is discharging pollutants into surface waters[5] and contaminating an underground drinking water source.

In Center for Biological Diversity, the defendant obtained a permit that authorized it to dredge shoreline adjacent to its property and the interior of the existing marina, and to use the dredged material as fill for building pads on the land. 566 F.3d at 798. The defendant, however, was forbidden from placing rock at elevations below lake bottom contours, from depositing sand below the ordinary high water mark, and from transferring fill or structures to neighboring wetlands. Id.

---

[5]The CWA does not define "surface waters." The term has been defined as "Water, such as rainfall runoff, that collects and flows on the ground but does not form a watercourse." Black's Law Dicitonary 1585 (7th ed. 1999).

The plaintiff sent three notices of alleged violations under 33 U.S.C. § 1344 of the CWA. The first two notices stated that § 1344[6] "was being violated by activities that began June 17, 2003, which activities were placing 'enormous amounts of fill' into the lake and were accompanied by grading below the ordinary high water mark." Id. at 802. The Ninth Circuit found these notices "questionable." Id. at 803. The third notice referred "only to piles of material that were causing discharges below the ordinary high water mark of the lake, and declares that the situation could be made worse should it rain." The Court concluded, "As we see it, that level of generality, again, is not really compatible with the purposes of the notice requirements under the CWA."

Here, the Court concludes that given the Defendant's history of violations of state environmental laws from its stockpiling operations Plaintiff's notice letter provides sufficient information describing that the alleged "operation" pertains to the "the disposal of solid waste from aluminum processing" that is discharging pollutants into surface waters, the Mt. Pleasant sewer system, and is contaminating an underground drinking water source.

Further, Defendant contends that while Plaintiff alleges that Defendant's facility is an "open dump" because the Stockpile allegedly contaminated an "underground drinking water source,"[7] Plaintiff fails to identify the alleged drinking water source. Defendant argues that the notice's legislative purpose is to give the alleged violator an opportunity to cure the alleged problem, but Defendant was unable to do so because of Plaintiff's failure to identify the source. Plaintiff contends that the notice does identify the contaminated ground water where it alleges that leachate from

---

[6]Section 1344 pertains to permits for dredged or fill material.

[7]An "underground drinking water source" is defined as "[a]n aquifer supplying drinking water for human consumption, or An aquifer in which the ground water contains less than 10,000 mg/l total dissolved solids." 40 C.F.R. § 257.3-4(c)(4).

Defendant's facility "contaminated an underground drinking water source beyond the solid waste boundary"[8] and that samples of ground water were "taken outside the TAP property boundary."

Plaintiff's notice letter states that samples of the ground water were taken, but fails to identify the specific location. However, Plaintiff's notice letter refers to groundwater adjacent to Defendant's facility at its property boundary. Thus, the Court concludes that Plaintiff provided sufficient notice of the alleged violations.

Defendant also argues that Plaintiff's notice letter, asserting that CWA and RCRA violations are "continuing" or that they "will continue into the future," does not provide Defendant with sufficient information as to when the alleged violations occurred or when such violations are likely to reoccur in the future, but rather Plaintiff's notice only alleges that residual effects of past conduct are continuing.

"Merely, alleging that a violation is 'continuing' is not sufficient notice." Stephens, 667 F. Supp.2d at 787. Here, Plaintiff's notice letter alleges that: (1) in sections I.A and I.B measurements of the discharge were taken on January 22, 2010 and March 25, 2010; (2) in section I.C. Defendant introduced ammonia contaminated leachate into Mt. Pleasant's "POTW since at least January 2010, including, but not limited to . . . January 21, 2010, February 4, 2010 [and] February 5, 2010; and (3) in section II that contaminated water samples were taken in January and February 2010. As to Plaintiff's section I allegations, Plaintiff provided specific dates of the alleged discharges, thus, satisfying the notice requirement. As to section II of Plaintiff's notice letter, Plaintiff references the

---

[8] "Solid waste boundary" means the outermost perimeter of the solid waste (projected in the horizontal plane) as it would exist at completion of the disposal activity. 40 C.F.R. § 257.3-4(c)(5).

dates mentioned in section I. Therefore, the Court concludes that Plaintiff has alleged sufficient information as to dates for it to be in compliance with the notice requirements.

Finally, Defendant contends that Plaintiff's notice letter is also defective because it threatens suit under 42 U.S.C. § 6972(b),[9] a RCRA provision that does not allow citizens suits as it imposes requirements upon citizens and not alleged violators. Plaintiff admits the notice improperly states 42 U.S.C. § 6972(b), but asserts that the notice contains specific allegations of the statutory and regulatory provisions that Defendant is violating.

The notice letter's conclusion states that Plaintiff intends "to file a citizen suit against the Tennessee Aluminum Processors, Inc., under 33 U.S.C. § 1365(a)(l) and 42 U.S.C. § 6972(b) for the violations discussed above." The "violations discussed above" refers to Plaintiff's allegations that Defendant's "facility is being operated in such manner as to constitute an open dump, as that term is defined in 42 U.S.C. § 6903(14) and in 40 C.F.R. Part 257. Under 42 U.S.C. § 6945(a) and 40 C.F.R. § 257.1(a)(1) and (2), the operation of an open dump is prohibited." Plaintiff also asserts violations under 40 C.F.R. §§ 257.3-3 and 257.3-4.

---

[9]Section 6972(b) provides, in pertinent part:

(1) No action may be commenced under subsection (a)(1)(A) of this section--
(A) prior to 60 days after the plaintiff has given notice of the violation to--
   (i) the Administrator;
   (ii) the State in which the alleged violation occurs; and
   (iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order . . .[or]

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

Notice under the RCRA must provide "sufficient information to permit the recipient to identify *the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated.*" 40 C.F.R. § 254.3. Here, Plaintiff's notice provides the specific regulations and requirements that were allegedly violated. Section 6972 provides the mechanism in which a citizen may bring suit and does not pertain to an alleged regulatory violation. Therefore, the Court concludes that Defendant's contention on this issue is without merit.

Next, Defendant contends that Plaintiff's complaint fails to state a claim for relief because Plaintiff's claims are based upon "wholly past violations," i.e., on the alleged effects of Defendant's past conduct, and therefore are not cognizable under the CWA and RCRA. Plaintiff contends that the violations alleged are continuing and are not wholly past.

In Crigler v. Richardson, No. 3:08-0681, 2010 WL 2265675 (M.D. Tenn. June 3, 2010), the plaintiffs alleged that defendants improperly disposed of construction debris and cement waste at a site that was used as an "'illegal dump that collected pollutants and chemicals discharging [them] into a stream and pond immediately down-grade of the site and onto the private property of Plaintiffs.'" Id. at *1. The plaintiffs alleged that in 2006 the defendants arranged for an individual to transport and dispose of the waste. Id. The Court concluded that "under the Sixth Circuit's interpretation of Gwaltney, the plaintiffs have alleged a 'wholly past' violation of the Clean Water Act and, therefore, lack standing." Id. at *7.

In reaching its conclusion, the Honorable Aleta Trauger cited two Six Circuit and two district court opinions. Id. The Court stated:

> In Ailor v. City of Maynardville, 368 F.3d 587 (6th Cir.2004), the court held that, where the federal complaint was not filed until "several weeks" after the "last reported violation" of the effluent standard, the citizen plaintiffs asserted a "wholly

22

past" violation and lacked standing unless the plaintiffs asserted that there were ongoing "continuous or intermittent violations" of the standard. Id. at 598-99.

Additionally, in an unpublished decision, the Sixth Circuit fully endorsed the Fourth Circuit's interpretation of a "wholly past" violation, finding that, to have standing, the citizen plaintiff must allege that the "violations [ ] continue[d] on or after the date the complaint is filed" or facts "from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Allen County Citizens for the Environment, Inc. v. BP Oil Co., 1992 WL 138410, *1-2 (6th Cir. June 18, 1992). District courts in this Circuit have also applied this definition of a "wholly past" violation, holding that a "historical" violation or a violation that is not "ongoing" cannot form the basis for citizen-suit relief. See Frilling v. Honda of Am. Mfg., 101 F.Supp.2d 841, 846-47 (S.D.Ohio 1998); Pirgim Pub. Interest Lobby v. Dow Chem. Co., 1996 WL 903839, *6 (E.D.Mich. Sept.25, 1996).

Id.

The Court noted that there was "nothing in the Third Amended Complaint to indicate that the[] defendants were engaging in violations of the Clean Water Act after [the dumping of the waste in 2006], let alone at the time that the original Complaint was filed in 2008 or at the time that these defendants were sued in March 2010." Id. The Court further noted that there was not "any suggestion from the Third Amended Complaint that any such violations by the[] defendants are 'continuous or intermittent.'"

On a motion to reconsider, the Court summarized the plaintiffs' contentions as follows:

As they did in the previous round of briefing, the plaintiffs contend that the Third Amended Complaint alleges that there are two sources of ongoing contamination in the relevant bodies of water. That is, (1) the defendants continue to actively dump materials and debris (pollutants) into the water ("active dumping" issue) and (2) materials and debris that have been previously dumped into the water "continue to release harmful substances" into the water ("previous dumping" issue).

Also, as they did before, the plaintiffs argue that the court should focus on their allegation that the pollution (from both sources) is continuing, rather than focusing on when Lone Star's conduct took place. That is, "while the acts and omissions occurred in 2006, the resulting violations continue to this day."

<u>Crigler v. Richardson</u>, No. 3:08-0681, 2010 WL 2696506, at *2-3  (M.D. Tenn. July 7, 2010).

The Court concluded that the "active dumping" theory against the defendant was not "facially plausible" because the only specific allegation was that in 2006 waste was dumped over a period of months "in such a way that it flowed into the relevant bodies of water, thereby polluting them." <u>Id</u>. at *4. "Other than cursory and vague allegations that 'all defendants' continue to pollute," there was not any allegations to suggest that the defendant's activity went beyond the incident in 2006 or that the defendant's waste was actively being dumped into the body of water at the time that the case was instituted against the defendant. <u>Id</u>.

As to the "previous dumping" issue, the Court explained:

[A]gain, there is a split of authority on this issue. That is, as the plaintiffs pointed out in initial briefing and again here, some courts have indicated that "so long as material deposited in a water of the United States remains in those waters," the violation is not wholly past. (Docket No. 202 at 11-12 citing <u>City of Mountain Park Georgia v. Lakeside at Ansley, LLC.</u>, 560 F.Supp.2d 1288 (N.D.Ga.2008); <u>Hernandez v. Esso Standard Oil Co.</u>, 597 F.Supp.2d 272, 286 (D.P.R.2009); <u>Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.</u>, 962 F.Supp. 1312, 1322 (D.Or.1997)). And, several courts have concluded that, once the polluter ceases his active pollution, the violation is wholly past.

In this context, the court looked for guidance from the Sixth Circuit and other district courts in this Circuit. While neither side came forward with direct Sixth Circuit authority, all indications from the Sixth Circuit cases cited in the Memorandum are that, if the Sixth Circuit were to consider this exact issue, it would find that the plaintiffs alleged a "wholly past" violation. That is, again, in both <u>Allen County</u> and <u>Ailor v. City of Maynardville</u>, 368 F.3d 587, 598 (6th Cir.2004), the Sixth Circuit focused on the defendants' conduct and whether the defendants were actively polluting at the time that the Complaint was filed, and the court did not focus on any possibility that the defendant would be liable under the CWA for the consequences of active pollution that had ceased by the time that the Complaint had been filed.

<u>Id</u>. at *5.

Here, Plaintiff alleges active and ongoing discharge of contaminated leachate by Defendant. The Court cannot discern from the filings whether the discharge is from an inactive slag pile or Defendant's ongoing operations. On a motion to dismiss, the Court must accept Plaintiff's allegations as true. Therefore, this issue cannot be resolved on a motion to dismiss.

Defendant next contends that Plaintiff's third claim, alleging that Defendant violated the CWA's wastewater pretreatment[10] requirements by discharging contaminated groundwater into Mount Pleasant's POTW[11] via inflow and infiltration into the City's sewer lines, is flawed because groundwater[12] is not regulated under the CWA. Plaintiff responds that its claim is not based upon whether the CWA regulates groundwater, but that Defendant is discharging pollutants into Mt. Pleasant's sewer system without a permit that is a violation of 33 U.S.C. § 1311(a)[13] and Tenn. Code Ann. § 69-3-125(a)(1)(C).[14]

---

[10]"The term Pretreatment means the reduction of the amount of pollutants, the elimination of pollutants, or the alteration of the nature of pollutant properties in wastewater prior to or in lieu of discharging or otherwise introducing such pollutants into a POTW." 40 C.F.R. § 403.3(s).

[11]"The term Publicly Owned Treatment Works or POTW . . . includes any devices and systems used in the storage, treatment, recycling and reclamation of municipal sewage or industrial wastes of a liquid nature. It also includes sewers, pipes and other conveyances only if they convey wastewater to a POTW Treatment Plant. 40 C.F.R. § 403.3(q).

[12]"'Ground water' means water below the land surface in the zone of saturation." 40 C.F.R. § 257.3-4(c)(3).

[13]33 U.S.C. § 1311 provides that "the discharge of any pollutant by any person shall be unlawful."

[14]Tenn. Code Ann. § 69-3-125(a)(1)(C) provides: "Any person, including, but not limited to, industrial users, who does any of the following acts or omissions shall be subject to a civil penalty of up to ten thousand dollars ($10,000) per day for each day during which the act or omission continues or occurs: (C) Fails to complete a filing requirement of a pretreatment program

Defendant contends that if Congress intended to include groundwater within the category of navigable waters, Congress would not have made explicit reference to navigable waters and ground waters separately. In support Defendant cites to CWA subchapter I that deals with program development and the study of water pollution where Congress consistently refers to "navigable waters[15] and ground waters," see, e.g., 33 U.S.C. § 1252(a); 33 U.S.C. § 1254(a)(5); 33 U.S.C. § 1256(e)(1), and CWA subchapter III that addresses water quality and discharge permitting where Congress only uses the phrase "navigable waters." See, e.g., 33 U.S.C. § 1312(a); 33 U.S.C. § 1342(a)(4).

Moreover, Defendant contends that Congress intended to exclude groundwater from CWA regulation, citing CWA legislative history, "[S]everal bills pending before the Committee provided authority to establish Federally-approved standards for groundwaters which permeate rock, soil, and other subsurface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation." S. Rep. No. 92-414 (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3739; see Exxon Corp. v. Train, 554 F.2d 1310, 1325-1329 (5th Cir. 1977) (recounting legislative history); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 965 (7th Cir. 1994) (citing the CWA's legislative history); Umatilla Water Quality Protective Ass'n v. Smith Frozen Foods, Inc., 962 F. Supp. 1312, 1318 (D. Ore. 1997 (citing statutory language and legislative history reflecting that the CWA does not apply to groundwater). Additionally, the House rejected an amendment that "would have brought groundwater within the permitting and enforcement sections of the bill." Umatilla, 962 F. Supp. at 1318-19 (citing 118 Cong.Rec. 10,669 (1972), 1 Leg. Hist. 597).

---

[15]"Navigable waters" means the waters of the United States. 33 U.S.C. § 1362(7).

Courts differ on whether groundwater is regulated under the CWA. See Rice v. Harken Exploration Co., 250 F.3d 264, 269 (5th Cir. 2001) ("The law in this Circuit is clear that ground waters are not protected waters under the CWA."); Oconomowoc Lake, 24 F.3d 962, 963-66 (7th Cir. 1994) (holding that contaminated groundwater, even though it may eventually reach streams, lakes, and oceans, is not part of the "waters of the United States," and is thus not regulated under the CWA); Kelly v. United States, 618 F. Supp. 1103, 1107 (W.D. Mich. 1985) ("[T]he remainder of the Exxon opinion and the unmistakably clear legislative history both demonstrate that Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination."); Cooper Indus., Inc. v. Abbott Labs., No. 93-CV-193, 1995 WL 17079612, at *4 (W.D. Mich. May 5, 1995); Patterson Farm, Inc. v. City of Britton, 22 F. Supp.2d 1085, 1091 (D.S.D. 1998); Umatilla, 962 F. Supp. at 1320 (D. Ore. 1997) (holding that "discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water").

Yet, other courts differ. See Wash. Wilderness Coalition v. Hecla Mining Co., 870 F. Supp. 983, 990 (E.D. Wash. 1994) ("any pollutant which enters [jurisdictional] waters, whether directly or through groundwater, is subject to regulation by NPDES permit"); Williams Pipe Line Co. v. Bayer Corp., 964 F. Supp. 1300, 1319-20 (S.D. Iowa 1997) ("Because the CWA's goal is to protect the quality of surface waters, the NPDES permit system regulates any pollutants that enter such waters either directly or through groundwater."); Mutual Life Ins. Co. v. Mobil Corp., No. Civ. A. 96-CV1781, 1998 WL 160820, at *3 (N.D.N.Y. 1998) (finding complaint alleging "a hydrological connection between the contaminated groundwater and navigable waters" sufficient to state a claim); Sierra Club v. Colorado Ref. Co., 838 F. Supp. 1428, 1434 (D. Colo. 1993) (stating "the [CWA's]

preclusion of the discharge of any pollutant into navigable waters includes such discharges which reach navigable waters through groundwater"); <u>McClellan Ecological Seepage Situation v. Weinberger</u>, 707 F. Supp. 1182, 1196 (E.D. Cal. 1988), *rev'd on other grounds* (finding that it would violate the CWA to discharge into "groundwater [something that] is naturally connected to surface waters that constitute 'navigable waters' under the Act"); <u>Friends of Santa Fe County v. LAC Minerals, Inc.</u>, 892 F. Supp. 1333, 1357 (D.N.M. 1995) (holding that the Act covers groundwater that eventually migrates to surface water).

In electing among these divergent views, environmental statutes are remedial statutes and are generally to be liberally construed. <u>Key Tronic Corp. v. United States</u>, 511 U.S. 809, 813 (1994); <u>RSR Corp. v. Commercial Metals Co.</u>, 496 F.3d 552, 554 (6th Cir. 2007); <u>FMC Corp. v. United States Dep't of Commerce</u>, 29 F.3d 833, 840 (3rd Cir. 1994); <u>Scott v. City of Hammond</u>, 741 F.2d 992, 998 (7th Cir. 1984) ("[W]e think that the CWA should be liberally construed to achieve its objectives."); <u>United States v. Velsicol Chemical Corp.</u>, 438 F. Supp. 945, 946 (W.D. Tenn. 1976) ("The purpose of the Water Pollution Prevention and Control Act of 1972, 33 U.S.C. § 1251 <u>et</u> <u>seq.</u>, is broad and remedial."). Thus, the Court elects to follow those courts holding groundwater is subject to the CWA provided an impact on federal waters.

Yet, of those courts that find that CWA jurisdiction applies to groundwater, the groundwater must have a direct hydrologic connection[16] to surface waters that are waters of the United States.[17]

---

[16]"'Direct hydrologic connection' implies that the groundwater flows to and enters the surface water body. However, the term has not been defined by the EPA, and the directness of hydrologic connection is generally very difficult to define or demonstrate on a site-specific basis." James W. Hayman, Regulating Point-source Discharges to Groundwater Hydrologically Connected to Navigable Waters: An Unresolved Question of Environmental Protection Agency Authority Under the Clean Water Act, 5 Barry L. Rev. 95 n.6 (2005).

[17]Waters of the United States is defined, in part, as:

(a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
(b) All interstate waters, including interstate "wetlands;"
(c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

    (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes;
    (2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
    (3) Which are used or could be used for industrial purposes by industries in interstate commerce;

(d) All impoundments of waters otherwise defined as waters of the United States under this definition;
(e) Tributaries of waters identified in paragraphs (a) through (d) of this definition;
(f) The territorial sea; and
(g) "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA . . . are not waters of the United States. This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States. . . .

40 C.F.R. § 122.2.

Idaho Rural Council v. Bosma, 143 F. Supp.2d 1169, 1179, 1180 (D. Idaho 2001) ("[C]ourts . . . generally agree that waters of the United States do not include isolated, nontributory groundwater, and that discharges of pollutants into such groundwater are not subject to CWA regulation. . . . [However,] the Court finds that the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States."); Kimberly Breedon, The Reach of Raich: Implications for Legislative Amendments and Judicial Interpretations of the Clean Water Act, 74 Univ. Cin. L. Rev. 1441, 1470 (2006) ("[C]ourts uniformly agree that CWA jurisdiction does not extend to groundwater having no perceived connection to surface waters."); Hayman, 5 Barry L. Rev. at 111-12 ("The district courts and courts of appeals decisions . . . when taken as a whole, express with a convincing majority that, if discharges to groundwater are regulated under the CWA, the groundwater must have a demonstrated direct hydrologic connection to surface waters which are waters of the United States.").

Plaintiff does not argue that the CWA applies to groundwater, but instead argues that under the language in 40 C.F.R. § 403.5 that "[a] User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference,"[18] Defendant is in violation of 33 U.S.C. § 1311 and Tenn. Code Ann. § 69-3-125(a)(1)(C). However, in its complaint, Plaintiff alleges that Defendant discharged pollutants in Mt. Pleasant's POTW "as a result of ground water contamination." (Docket Entry No. 1, at ¶ 37). To have a violation, there must be an entry of pollutants into the POTW. Plaintiffs complaint, in essence, alleges that groundwater provides the vehicle in which the alleged

---

[18]"The term Pass Through means a Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation)." 40 C.F.R. § 403.3(p).

pollutants are introduced into Mt. Pleasant's POTW. Thus, there could not be a violation without the alleged pollutants being introduced by way of groundwater. Therefore, the Court concludes that the CWA's applicability to groundwater is relevant to Plaintiff's claim.

"Pass Through" is a defined as "a Discharge which exits the POTW into waters of the United States." 40 C.F.R. § 403.3(p). "The Clean Water Act . . . establishes pretreatment standards for discharges *into* a 'publicly owned treatment works;' it does not apply to contaminants that are discharged into groundwater and never reach a 'treatment works.'" Lincoln Properties, Ltd. v. Higgins, No. S-91-760DFL/GGH, 1993 WL 217429, at *11 (E.D. Cal. Jan. 21, 1993) (emphasis in original). Thus, the Court concludes that at this stage of the litigation there are issues of fact that the Court cannot resolve on a motion to dismiss. "Of course, plaintiff ultimately will have to prove a link between contaminated ground waters and navigable waters. A general hydrological connection among all waters will be insufficient, and [Plaintiff] will have to trace pollutants from their source to surface waters." Mutual Life Ins., 1998 WL 160820, at *3.

Finally, Defendant contends that Plaintiff's claim that Defendant's stockpile is an open dump under the RCRA fails because citizens may only assert a claim against "open dumping" under 42 U.S.C. § 6945[19] and may not assert a claim for maintaining an open dump under 42 U.S.C. § 6944.[20]

---

[19] 42 U.S.C. § 6945 provides, in part: "Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping."

[20] 42 U.S.C. § 6944 provides, in part: "[T]he Administrator shall promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps within the meaning of this chapter. At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there

Defendant asserts that because Plaintiff pled that Defendant is maintaining an open dump[21] (a "facility"), and did not plead that Defendant is engaging in the ongoing "practice" of opening dumping, Plaintiff's open dump claim fails. In support Defendant cites Mervis, supra, and South Road Assoc's. v. Int'l Bus. Mach's. Corp., 216 F.3d 251, 257 (2d. Cir.2000).

In Mervis, the plaintiff alleged that the defendant disposed of waste at its property, and that the waste "'contaminated and continues to contaminate the soil, the groundwater, and the surface water in and near the Properties,' and is leaching into [a nearby creek.]" 2010 WL 1381671 at *1. The court concluded that "the mere presence of pollutants is not sufficient to allege an ongoing violation of the open dumping prohibition." Id. at *3.

In South Road Assoc's., the Second Circuit stated that "SRA alleges that IBM is in violation of 42 U.S.C. § 6945(a) and 40 C.F.R. § 257.3-4(a), each of which constitutes a part of RCRA's prohibition on open dumps and open dumping." 216 F.3d at 255. The Second Circuit noted: "Because we see no functional difference between "open dump" and "open dumping," and because the statutory and regulatory schemes do not appear to differentiate between the two in any meaningful way, we treat the two as the same." Id. at 255 n.3. However, the Second Circuit stated that "SRA can maintain this action only if IBM was at the time of filing 'engaged in the act of open dumping.'" Id. The Second Circuit acknowledged that § 6945's wording and the statutory provisions

_____

is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility. Such regulations may provide for the classification of the types of sanitary landfills."

[21]"The term 'open dump' means any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste." 42 U.S.C. § 6903(14).

implicated by it do "not say whether an ongoing violation of the open-dumping provisions requires ongoing conduct." Id. at 256. The Second Circuit further stated:

> According to SRA, it is the fact of M.C.L. exceedances-caused by IBM's past acts, but still present at the site and causing groundwater contamination-that constitutes a violation of the provision requiring that a facility or practice "not contaminate" the groundwater. We conclude that that is not enough. The term "contaminate" is defined: " '[c]ontaminate' means *introduce* a substance that would cause" M.C.L. exceedances. 40 C.F.R. § 257.3-4(c)(2) (emphasis added). What is prohibited by the statute and the regulation (read together) is the act of introducing a substance that causes M.C.L. exceedances, not the action of the M.C.L. exceedances on the environment.

> Accordingly, the complaint does not plead that IBM is engaged in the forbidden act of open dumping *unless* the complaint alleges that IBM is introducing substances that would cause exceedances.

Id. at 256-57 (emphasis in original). The Second Circuit concluded that the defendant's past actions of depositing waste constituted a "historical act" that did not constitute a violation under 42 U.S.C. § 6945(a). Id. at 257.

In its complaint, Plaintiff alleges that Defendant "violated and is violating . . . 42 U.S.C. § 6945(a), by maintaining an 'open dump' for land disposal of solid waste at the TAP facility." (Docket Entry No. 1, at ¶ 65). The South Road Assoc's. Court recognized that there was not a functional difference between "open dump" and "open dumping." Thus, the Court concludes that Plaintiff's complaint alleges sufficient factual allegations to state a claim and that an issue of fact remains as to whether the Defendant's "maintaining an 'open dump'" at its facility constitutes open dumping.

For these reasons, the Court concludes that Defendant's motion to dismiss (Docket Entry No. 11) should be denied. Defendant's motion for protective order (Docket Entry No. 31) and Plaintiff's motion to compel (Docket Entry No. 35) are denied as moot. Defendant shall respond to Plaintiff's

33

First Set of Requests for the Production of Documents within thirty (30) days of the entry of the

Court's order.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of April, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge